In the Matter of Louis P. ATTOMA et al., Doing Business as NORTONIAN NURSING HOME, Respondents, *v.* STATE DEPARTMENT OF SOCIAL WELFARE OF THE STATE OF NEW YORK et al., Appellants.

Fourth Department, May 19, 1966.

14

*Louis J. Lefkowitz, Attorney-General* (*Winifred C. Stanley, Ruth Kessler Toch, Herbert H. Smith* and *Ruth V. Iles* of counsel), for appellants.

*Salzman, Salzman & Pheterson* (*Sidney J. Salzman* of counsel), for respondents.

BASTOW, J. P. The judgment before us for review mandates the appellants (State Department of Social Welfare and individual defendants constituting the State Board of Social Welfare) to process and pass upon the application of petitioners to operate a private proprietary nursing home in accordance with the applicable provisions of the Social Welfare Law and the rules and regulations of the appellants, Department and Board, as they existed prior to October 1, 1964.

For nearly a decade persons proposing to operate a private proprietary nursing home have been required by statute to obtain the written approval of the State Department of Social Welfare (Department). (L. 1956, ch. 589, as amd.) The Rules of the State Board of Social Welfare (Board) provided prior to October 1, 1964 that no building to be used for such purpose could be constructed except on plans and designs approved in writing by the Department (18 NYCRR 27.13). The Regulations of the Department further provided that the owners of such a home should be of good reputation and should have sufficient finances to assure compliance with the Rules of the Board and the Regulations of the Department (18 NYCRR 476.2).

In 1964 the so-called Metcalf-McCloskey Bill was enacted and became effective on October 1, 1964 (L. 1964, ch. 730). This legislation amended certain sections of the Public Health and Social Welfare Laws and made additions thereto. There was created within the State Department of Health a State Hospital Review and Planning Council comprised of 31 persons to be appointed by the Governor. Upon this body and local hospital review and planning councils was placed the responsibility of making recommendations to the Board as to the need, among other things, for the construction of new hospitals and nursing homes. The Department was mandated (L. 1964, ch. 730, § 5) not to approve the establishment of a private proprietary nursing home unless it was satisfied, among other things, as to " the public need for the existence of the home at the time and place and under the circumstances proposed ".

The petitioners proposed to operate a proprietary nursing home as copartners doing business as Nortonian Nursing Home. An intelligent understanding of events requires a brief recital

of their plans. Hamill, one of the petitioners, was president of Boston Agency, Inc. (Boston) which owned the land upon which the nursing home was to be constructed. It was proposed to organize a corporation (Northside Intermediate Care Center, Inc.) and this *de facto* corporation (Northside) had entered into an option to lease the land from Boston. Northside in turn proposed to erect a building at a cost of $500,000 and to enter into a lease with petitioners as copartners of the land and building for a term of 20 years at a base annual rental of $10,400 plus all payments of principal and interest to be made by Northside upon any mortgage obtained by it for the purpose of financing the construction of the building.

On June 26, 1964 an attorney for petitioners conferred with a representative of the Rochester office of the Department. He was told that under the existing statute, rules and regulations (until October 1, 1964, the effective date of the new law) it would be necessary to submit (1) an application for construction with proposed plans and specifications; (2) an application (Form WI-121) for each individual participating in the project and (3) certain completed legal documents including certificate of incorporation of Northside, partnership agreement of petitioners, certificate of petitioners of doing business under an assumed name, lease between Boston (the landowner) and Northside and lease between Northside and the partnership.

In evaluating what took place thereafter it is apparent that all parties knew that time was of the essence if the project was to be approved by appellants during the ensuing three months before the new law became effective on October 1, 1964. On August 13 the construction application and construction plans were submitted to the Rochester office of the Department and promptly forwarded to the Albany office. Three days later the employee of the Department, who had first conferred with the attorney, telephoned him and urged submission of the other papers '' as quickly as possible to complete total application.'' On August 20 the attorney presented the applications of the seven proposed partners. When inquiry was made about the additional documents (partnership agreement, leases, etc.) the attorney stated that '' they would be furnished as soon as possible.''

On the same date (August 20) the construction plans were returned to petitioners' attorney with a letter setting forth required changes therein. Significantly, in the light of petitioners' present contentions, the memorandum from the Department's Chief Architect to the Rochester office stated that '' This interim review has been made out of sequence as a cooperation

measure to the applicant. No further ' out of sequence ' reviews can be made due to the pressure created by the October 1, deadline.''

On August 28 petitioners' attorney and one Handler, their architect, conferred in Albany with Mr. Mettauer, the Department's Chief Architect, about the requested changes in the construction plans. Upon the trial Handler admitted that it was implied at the conference that the prompt review of the plans was as a favor to petitioners. The attorney (according to his testimony) was told by Mettauer that if the necessary changes were made '' he (Mettauer) could see no reason why [the plans] wouldn't be approved.''

On September 14 the Department's investigation of petitioners was completed and this portion of the application was ready for approval. It was not, however, until Friday, September 25, that the corrected plans were submitted to the Department's Rochester office. They were received in the Albany office the following Monday — two days before the new law became effective. The other documents were never submitted and there was no proof at the trial that any affirmative action had been taken either before or after October 1, 1964 to incorporate Northside, to execute either of the leases, the partnership agreement or the certificate of doing business under an assumed name.

It is the contention of appellants, however, and so the trial court in substance found, that the certificate of incorporation of Northside, the leases and other papers were not executed because of a telephone conversation the attorney had with an employee of the Department's Rochester office on September 4, 1964.

It appears that on July 28, 1964 the Board had adopted a resolution pertaining to the processing of applications under the old and new laws. A '' whereas '' clause therein recited that '' on the basis of past experience '' applications '' could not be processed *in regular order* prior to October 1, 1964 unless received by the Department by July 31, 1964.'' The resolution stated '' that the Department be authorized *to the extent feasible,* to process applications filed with it on and after August 1, 1964 '' in accordance with the new law. (Emphasis added.)

On September 4, as stated, the attorney had a telephone conversation with an employee of the Department. The latter made a memorandum of the conversation which was received as an exhibit at the trial. The resolution of June 28 had come to her attention and she told the attorney about it. She further informed him that '' we couldn't give them assurance

it would be approved at all, but we would continue to process the application.''

The contention of appellants that upon receiving this message they and their attorney became convinced that further action would be futile taxes credulity. The record bespeaks the preferential treatment that the application was receiving in both the Rochester and Albany offices of the Department. Less than a week before (August 28) the representatives of petitioners had conferred with the Chief Architect. Although the resolution had been adopted a month before (July 28) they were then told that the Department saw no reason why the plans would not be approved.

Moreover, it is significant that the Department's employee at the same time conveyed the same information about the resolution to four other parties who had applications pending and two of the four were approved before the deadline of October 1. One of these, it was testified, had not progressed as far as petitioners' application.

We conclude that the delay was caused by certain other facts that none of the parties has emphasized and as to which the trial court made no findings. The land upon which the nursing home was to be constructed was zoned R-5. The proposed building violated the permissible use in such a zone in two respects — one of which was the allowable percentage of a structure on the available land. These impediments required the granting of a variance by the Zoning Board. After the first hearing the request was denied but was granted following a second hearing on September 30, 1964 — the day before the new law became effective.

It is apparent that this was the proximate cause of the delay and not any act of appellants. The granting of a variance was an obvious condition precedent to further action. No reasonable persons would organize a corporation and enter into a long-term lease with the landowner and a further long-term lease with petitioners by which it was agreed to construct a building at a cost of half a million dollars in the face of an existing ordinance prohibiting such construction.

All of this readily explains the long delay in filing the revised construction plans and further makes clear why the other necessary documents were not executed or filed prior to October 1, 1964. The trial court erred in concluding that these documents were not required to be filed and that the revised construction plans were timely filed on September 25 so that the Department with due diligence could have approved the application prior to October 1, 1964.

Lastly, petitioners assert that chapter 730 of the Laws of 1964 is unconstitutional on the ground that its requirement that an applicant for approval to operate a nursing home must establish that there is "need" for a new facility is not a reasonable exercise of the police power.

The legislation resulted from an exhaustive study by a joint legislative committee (cf. Report of the Joint Legislative Committee on Health Insurance Plans, N. Y. Legis. Doc., 1964, No. 39, pp. 72–110). Therefrom it appears that the uncontrolled construction of unnecessary or substandard hospital and nursing home beds may be one of the causes of the spiraling cost of medical care. Thus, it is unnecessary to rely on the presumption that the Legislature has investigated and found facts necessary to support the legislation. (Cf. *I. L. F. Y. Co.* v. *Temporary State Housing Rent Comm.,* 10 N Y 2d 263, 269.) " ' Where the question of what the facts establish is a fairly-debatable one, we accept and carry into effect the opinion of the legislature ' [citing cases]. Nor may courts substitute their judgment for that of the Legislature so long as there can be discovered ' any state of facts either known or which could reasonably be assumed ' to afford support for the legislative decision to act ". (*Lincoln Bldg. Assoc.* v. *Barr,* 1 N Y 2d 413, 415.)

It is now recognized that the operation of so-called nursing homes bears a reasonable relation to the health, safety and welfare of a community and is subject to licensing and regulation as a valid exercise of the police power. (Ann. 97 ALR 2d 1187.) The proliferation of such homes beyond the needs of a geographical area with spiraling costs to the users thereof bears a similar reasonable relation to the welfare of the community and may not be found to be an invalid exercise of the police power. Applying these tests we conclude that the enactment is not unconstitutional on the grounds asserted by petitioners.

The judgment should be reversed and the petition dismissed.

Goldman, Henry, Del Vecchio and Marsh, JJ., concur.

Judgment unanimously reversed on the law and facts, without costs of this appeal to any party and petition dismissed, without costs. Certain findings of fact disapproved and reversed and new findings and conclusions made.